AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
9/17/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____asi_____ DEPUTY



**FILED**
CLERK, U.S. DISTRICT COURT
09/17/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___DC___ DEPUTY

United States of America

v.

DELFINO ELIZALDE-FIERRO,

    Defendant

Case No.    5:25-mj-00584-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of September 15, 2025 in the county of San Bernardino in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii) | Possession With Intent to Distribute |
| 8 U.S.C. § 1326(a) | Reentry of Removed Alien |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Darwin Anderson, Border Patrol Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:       09/17/2025                      _____
*Judge's signature*

City and state:   Riverside, California        Hon. A Joel Richlin, U.S. Magistrate Judge
*Printed name and title*

AUSA:_Sean Peterson (x6930)

## **AFFIDAVIT**

I, Darwin Anderson, being duly sworn, declare and state as follows:

### I.    PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against Delfino Elizalde-Fierro ("ELIZALDE"), charging him with violating Title 8, United States Code, Sections 1326(a): Illegal Alien Found in the United States Following Removal or Deportation, and Title 21, United States Code, Section 841(a)(1): Possess with Intent to Distribute a Controlled Substance.

2.    This affidavit is also made in support of an application for a warrant to search one digital device, a Samsung Galaxy A15 bearing serial number R5CY746FMVR ("SUBJECT DEVICE"), seized from ELIZALDE on September 15, 2025, and currently in the custody of United States Border Patrol, in Indio, California, as described more fully in Attachment A.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 ("Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show that there is sufficient probable cause for the requested complaint and

warrant and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically noted otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  BACKGROUND OF Border Patrol Agent Darwin Anderson

5.  I am a United States Border Patrol Agent ("BPA") with the Department of Homeland Security ("DHS"), Customs and Border Protection, United States Border Patrol ("USBP").  I have been employed as a full-time, sworn USBP BPA since August 21, 2016, and graduated from the USBP Basic Border Patrol Training Academy located in Artesia, New Mexico.  The Academy curriculum covered specialized training in the Immigration and Naturalization Act, criminal law, and statutory authority, as well as cross-training in Title 21, United States Code, and in Title 19, United States Code.

## III.  TRAINING AND EXPERIENCE REGARDING FINGERPRINTS AND DHS DATABASES

6.  Based on my training and experience and communication with DHS employees, I know the following:

a.  Every person has a unique set of fingerprints. I also know that unique identification numbers – including, but not limited to, Fingerprint Identification Number System ("FINS") numbers and Federal Bureau of Investigations ("FBI") numbers – can be assigned to a person's fingerprints, thereby distinguishing that person's fingerprints in law enforcement databases from another person's fingerprints.  In many cases, the Department of Homeland Security ("DHS") and other

2

government agencies utilize FINS and FBI numbers to associate
unique fingerprint records and information to a specific
individual.

b.  Moreover, when a person is fingerprinted by DHS
agencies, such as USBP, those unique fingerprint identifiers
are associated with an individual's unique alien number ("A-
number") and alien file ("A-file").  An A-file typically
contains official documentation regarding a person's
deportation or removal history as well as alienage.  That A-
file is maintained in DHS custody, and documents and
information from that A-file are uploaded to official DHS
databases that can be accessed to determine, among other
things, whether a person has been removed or deported from the
United States, whether that person is a foreign national, and
whether that person has been lawfully admitted into the United
States, pursuant to, for example, a non-immigrant visa.

7.  Generally, after an arrest for a criminal offense, a
person's biometric fingerprint information is obtained and
enrolled into a nationwide repository for criminal history
records as part of a normal booking process.  That information
is then associated with a unique identification number for the
person's fingerprints, typically the FBI number, which is
searchable within various law enforcement indices and
comparable with other government records, including those
belonging to DHS and those associated with an A-file and A-
number.  A match between fingerprint identifiers can therefore
be used to confirm the identity of a person associated with

specific records, including immigration records indicating whether that person is amenable to immigration enforcement action.

### IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   BORDER PATROL IDENTIFIES SUSPICIOUS VEHICLE

8.   On September 15, 2025, Indio Border Patrol Agents ("BPA") assigned to the Indio Station Disrupt Team ("IDT") were conducting operations near Helendale, California.  IDT agents were operating in plain clothes but wearing body armor with insignia, identifiers, and a badge indicating they are law enforcement.  IDT agents were utilizing unmarked police vehicles.

9.   This area consists of National Trails Highway which runs alongside BNSF Railroad tracks.  BNSF Railcars are commonly broken into and robbed in this area.  This area is also utilized by narcotics and human smugglers to avoid detection on major interstates and highways in the surrounding area.  BPAs assigned to the IDT are familiar with the operations of train robbers, narcotics smugglers, and alien smugglers that have been encountered in this area.  IDT agents are knowledgeable in the patterns and the behaviors of those individuals and are experienced in targeting those activities.

10. National Trails Highway/Route 66, which runs adjacent to both Interstate 15 and Interstate 40 in the area, is frequently utilized by illegal alien and drug smugglers due to the highway's proximity to other major interstates and highways that connect to the to the greater Los Angeles area.  Los

Angeles, California is a source city for narcotics and a common place for illegal aliens and narcotics to travel to after entering the United States in Western Arizona and Southern California.  There are several highways that run north from border areas in Eastern California and Western Arizona that connect to Interstate 40, which includes National Trails Highway/Route 66.  As such, it is common for individuals smuggling illicit cargo to drive north on one of these highways and then west on Interstate 40 towards Barstow, California to connect to a route that eventually leads to Los Angeles, California.  Border Patrol has seen an increase in human trafficking, narcotics, and train robbery cases recently on Interstate 40 and National Trials Highway/Route 66.  Border Patrol Agents have also seen an increase of cases in the Helendale, California and Hinkley, California area due to their remoteness and the lack of a law enforcement presence.

11. San Bernardino County has experienced a notable surge in train robberies, narcotics smuggling, and illegal alien smuggling.  Due to the area's extensive rail network that serves as a key transportation corridor, BPAs have begun focusing on the area for nearly the past three years.  The county's vast stretches of remote desert terrain and critical freight routes make it an attractive target for criminals looking to intercept cargo.  The rural characteristics of the area, along with limited law enforcement resources, leave the area vulnerable to utilization by individuals looking to conduct illicit activities.

12. BPAs have identified pattern of Hispanic male adults conducting these illicit activities, a large majority of whom have originated from Sinaloa, Mexico and are in the United States illegally. Based on BPAs training and experience, previous cases in that area, and through conversations with local law enforcement in that area, trends of vehicles that have been utilized in illicit activity have been identified. Older model vehicles that are registered from out of the area, to include the Greater Los Angeles area, Orange County, and the High Desert of California have been identified as commonly utilized in the commission of illicit activities.

13. On September 15, 2025, at approximately 10:10 p.m., while traveling southwest on National Trails Highway, BPAs Nava and Corona encountered an older model Honda Accord ("Accord"). BPAs Nava and Corona were driving in an unmarked, white Tahoe. While their vehicle did not have law enforcement markings, it is a characteristic law enforcement vehicle. When BPAs drove past the Accord, BPAs noticed that the Accord suddenly applied its brakes for no apparent reason. BPAs have noticed that vehicles that display this behavior are showing precaution towards a law enforcement vehicle. BPAs then made a U-turn to further investigate the vehicle.

14. When BPAs turned around, BPA Nava noticed that the Accord had increased its speed in what appeared to be an attempt to place a greater distance between the Accord and the BPAs. BPAs have also seen this tactic utilized by individuals

to gauge if they are being followed or investigated by law
enforcement.

15. The Accord hesitated and then turned north onto
Hinkley Road which is mainly used by locals and seldom used by
vehicles from out of town. BPAs continued to follow the Accord
north on Hinkley Road. The Accord then began to drive more
erratically, drifting between the lanes of the road, and
tapping on its brakes at times that were inconsistent with the
necessities of the road. The Accord was driving in a manner
that indicated the driver was not familiar with the area or was
uncomfortable with a law enforcement vehicle driving behind it.
At this time, BPAs Nava and Corona conveyed license plate and
make and model of the Accord to BPA Rubalcava to query database
checks. BPA Rubalcava provided record checks on the Accord,
which was registered out of Anaheim, California. Records
indicated that the Accord's registration was expired. BPA
Rubalcava also informed BPAs Nava and Corona that the vehicle
had no prior travel in the area for the past 24 months. This
was based on a query using a commercial license plate reader
system installed in 2020 in the Helendale, California area.

16. The Accord approached the intersection and onramps of
State Highway 58 on Hinkley Road and stopped at the stop sign
on the south side of State Highway 58. The Accord made an
extended stop at the stop sign as if they had not decided where
their intended travel destination was, inconsistent with the
normal driving behaviors of local traffic in the area. The
Accord then continued north and passed State Highway 58. BPAs,

through their knowledge and experience working in this area, know that the route that the Accord drove was not the fastest route to get from Anaheim, California, to the current location. The fastest route of travel utilizes Interstate-15 north to State Highway 58 east. BPAs are familiar with subjects utilizing rural routes of travel in that area to aid in avoiding major interstates and highways during their travel. BPAs are aware that these routes are utilized to avoid law enforcement vehicles and law enforcement encounters.

### B.    BORDER PATROL CONDUCTS VEHICLE STOP

17. At 10:21 p.m., once the Accord passed all onramps and methods of entry onto State Highway 58, and after following the Accord for approximately 10 miles, BPAs decided to initiate a vehicle stop.

18. The Accord yielded and had one visible occupant. BPAs approached the Accord and began a conversation with the driver, later identified as ELIZALDE. ELIZALDE responded to BPAs in the Spanish language. BPAs immediately noticed a strong odor of marijuana emanating from the vehicle. ELIZALDE also had bloodshot eyes. BPAs then asked where he was going. ELIZALDE stated he lived roughly 20 minutes away towards the mountain. ELIZALDE stated he was going home but could not provide the city or location of his home. BPAs then asked the subject if he had identification on him. ELIZALDE then began stepping out of the vehicle. BPAs asked ELIZALDE to stop, and again asked him if he had identification, to which ELIZALDE stated that it was in the back seat of his vehicle.

8

19. BPAs allowed ELIZALDE to step out of the vehicle to retrieve his identification.  While ELIZALDE was searching for his identification, BPA Nava noticed a carboard box in the rear driver side passenger seat that was seat belted in.  Once ELIZALDE stepped out of the vehicle and provided an identification card to BPAs, he was asked to remain outside of the vehicle for safety reasons.

20. The identification that ELIZALDE provided was a Mexican National identification bearing the name "Francisco CARRASCO-Lopez."  BPA Nava noticed that the card did not appear to be authentic.  BPA Nava took a photo of ELIZALDE and ran it through DHS databases.  The search returned a positive hit to an individual that looked like ELIZALDE and shared the same date of birth that ELIZALDE provided.

21. BPA Nava then asked ELIZALDE if he had ever used another name before, to which he replied he had not.  BPA Nava asked ELIZALDE if he had ever used the name "Delfino ELIZALDE-Fierro."  ELIZALDE stated that he had used that name before in the past.  Record checks on the name "Delfino ELIZALDE-Fierro" with a date of birth of "**/**/1996,"[1] revealed that ELIZALDE had previously been removed from the United States.

22. BPAs then asked ELIZALDE if he had any documentation to enter, live, or remain in the United States, to which replied that he did not.  BPAs asked ELIZALDE if he was in the country illegally, and ELIZALDE stated that he was in the

---

[1] The date of birth was known to BPA Nava and BPA Rubalcava, and I know it as well.

country illegally and that he did not possess any documentation to remain in the United States legally. BPA Nava then placed ELIZALDE under arrest for being in the country illegally.

23. During a pat down search of ELIZALDE following his arrest, the SUBJECT DEVICE was discovered in his left rear pant pocket.

24. BPA Nava walked ELIZALDE to his service vehicle and placed him in the vehicle while the investigation continued.

25. BPA Ceballos and his canine partner, Zuza were also present at the vehicle stop. BPA Ceballos and Zuza are certified in the detection of concealed humans and several narcotics including cocaine. BPA Ceballos escorted Zuza to the Accord and allowed Zuza to conduct a non-intrusive, free-air sniff outside of the Accord. BPA Ceballos informed agents that Zuza alerted to the Accord. BPAs Nava and Corona then assisted BPA Ceballos with the search of the vehicle.

26. During the search of the vehicle, the carboard box that was in the rear seat of the vehicle was examined. The box was opened and contained another box which was insulated with spray foam that was still moist. The secondary box was also opened and contained two cellophane wrapped bundles, later weighing in at a gross weight (including packaging) of 2.6 kilograms. Inside the cellophane bundles was what appeared to be a white powdered substance. The white powdery substance was tested in the field with a NIK test. The results came back positive with the characteristics of cocaine.

27. ELIZALDE was advised of his <u>Miranda</u> rights in the field at approximately 11:00 p.m.  ELIZALDE invoked his right to remain silent.

28. ELIZALDE was then transported to the Indio Border Patrol Station for further processing.

**C.    IDENTITY CONFIRMATION**

29. At the station, ELIZALDE's biographical data and fingerprints were captured using Border Patrol's E3 Processing System.  This information returned a positive hit for ELIZALDE and revealed that ELIZALDE had been issued an A-Number and an FBI Number.  I know that A-Numbers are a unique identifier assigned to one individual and are used to track immigration related events.  I also know that FBI numbers are unique identifiers assigned to one individual and are used to track criminal related events.

**D.    ELIZALDE WAS PREVIOUSLY REMOVED TO MEXICO**

30. On or about September 16, 2025, I reviewed the printouts of Immigration and Customs Enforcement ("ICE") computer indices on ELIZALDE.  These records show that ELIZALDE is a citizen of Mexico.  Based on my training and experience, I know that the ICE computer indices track and document each time an alien is deported or excluded from the United States by ICE, was deported or excluded by the former Immigration and Naturalization Service, or is granted permission to enter or re-enter the United States.  The ICE computer indices revealed the following:

a.  On or about February 25, 2015, ELIZALDE was ordered removed, deported, and/or excluded from the United States and was physically removed from the United States to Mexico the same day, through the Nogales, Arizona Port of Entry.

b.  On or about August 20, 2015, ELIZALDE was ordered removed, deported, and/or excluded from the United States and was physically removed from the United States to Mexico on March 16, 2016, through the Del Rio, Texas International Bridge Port of Entry.

c. On or about June 14, 2018, ELIZALDE was ordered removed, deported, and/or excluded from the United States and was physically removed from the United States to Mexico on June 14, 2018, the same day through the Calexico, California Port of Entry.

d. On or about February 15, 2020, ELIZALDE was ordered removed, deported, and/or excluded from the United States and was physically removed from the United States to Mexico on August 5, 2020, through the Nogales, Arizona Port of Entry.

31. The ICE computer indices further showed that ELIZALDE had not applied for, or obtained from the Attorney General or the Secretary of Homeland Security, permission to re-enter the United States.  Based on my training and experience, I know that such documentation is required to re-enter the United States legally after deportation, and that if such

documentation existed, it would ordinarily be found in the DHS A-File and in DHS databases.

32. On or about September 11, 2025, I reviewed ELIZALDE's criminal record which showed the following:

a. On or about August 28, 2014, in the United States District Court of Arizona, ELIZALDE was convicted of knowingly and intentionally possessing a quantity of a Schedule I controlled substance, in violation of Title 21 of the United States Code § 844(A). For this offence, ELIZALDE was sentenced to 210 days of confinement.

b. On or about August 4, 2020, in the United States District Court of Arizona, ELIZALDE was convicted of reentry of removed alien, in violation of Title 8 of the United States Code § 1326(a). For this offence, ELIZALDE was sentenced to a time-served sentence which amounted to approximately 172 days.

## V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

33. As used herein, the term "digital device" includes the SUBJECT DEVICE.

34. Based on my experience and training, I am familiar with the methods employed in smuggling operations and the smuggling patterns employed by such organizations.  I have also spoken with other experienced agents and other law enforcement officers about their experiences and the results of their investigations and interviews.  I have become familiar with the methods of operation typically used by narcotic smugglers. Based on my training, experience, my conversations with other

law enforcement officers, and my knowledge of this investigation and others, I am aware of the following:

35. Narcotic smuggling is generally a continuing criminal activity taking place indefinitely unless interrupted by law enforcement action. Indeed, based on my training and experience, individuals who have established an income based on smuggling tend to continue the activity for prolonged periods of time because that is how they make a living.

36. Narcotic smugglers often use one or more telephones, pagers, or other digital devices, sometimes in fictitious and/or other individuals' names, to communicate with other participants in their smuggling operations, including co-conspirators and customers, regarding matters such as price, arrival time, and meet location. This communication can occur by phone, text, email, or social media. Narcotic smugglers maintain in such devices telephone and other contact information which reflects names, addresses, and/or telephone numbers of their associates in the narcotic smuggling organization, as well as customers of the narcotic smuggling business. Further, narcotic smugglers will also use text messages to send photographs as codes or actual pictures or videos. I know that the above-described information can be stored on digital devices carried by narcotic smugglers.

37. In addition, I know that professional smuggling operations depend upon maintaining both long-distance and local contacts with individuals in the source country who arrange the initial payment and embarkation, as well as those in the United

States who facilitate arrival and collection of any remaining smuggling fees.  Smugglers often use fraudulent information to subscribe to cellular telephones, maintain separate customer and supplier telephones, and frequently change cellular telephones to thwart law enforcement efforts to intercept their communications.  Smugglers frequently use pre-paid telephones and/or false or misleading subscriber information as a way of distancing themselves from criminal liability.

38. Individuals involved in narcotic smuggling commonly obtain partial payment from customers prior to embarkation and accept the remaining payment upon safe arrival in the United States.  Therefore, I am aware that individuals involved in narcotic smuggling maintain books, customer lists, receipts, notes, ledgers, and other records relating to the negotiated price for a customer and any partial payments made or due, and that such documents may be in code to attempt to thwart law enforcement detection.

39. Smugglers keep records of their illegal activities for a period of time extending beyond the time during which they actually transport a particular customer, in order to maintain contact with criminal associates for future smuggling operations, and to have records of prior transactions for which, for example, they might still be owed payment, or might owe someone else money

40. Narcotic smugglers frequently use Global Positioning System ("GPS") devices to navigate.  I know that GPS devices often store route history information of previously travelled

15

routes.  Among other things, this information may reveal
locations used to stash smuggled items as well as the locations
utilized by co-conspirators.

41. Data contained on digital devices used by smugglers
often include, among other things, records of telephone calls,
text messages, e-mail and social media communications between
the smugglers and the co-conspirators; Global Positioning
System ("GPS") information and other location information that
can help identify embarkation and landing locations, meeting
places, and smuggling routes; and identifying information about
the smuggler and co-conspirators, such as contact lists,
calendar appointments, and photographs or videos.

### VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

42. Based on my training, experience, and information
from those involved in the forensic examination of digital
devices, I know that the following electronic evidence, inter
alia, is often retrievable from digital devices:

   a.   Forensic methods may uncover electronic files or
   remnants of such files months or even years after the
   files have been downloaded, deleted, or viewed via the
   Internet.  Normally, when a person deletes a file on a
   computer, the data contained in the file does not
   disappear; rather, the data remain on the hard drive
   until overwritten by new data, which may only occur
   after a long period of time.  Similarly, files viewed
   on the Internet are often automatically downloaded
   into a temporary directory or cache that are only

overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

     d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

43. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

     a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

     b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word

documents, or 614 photos with an average size of 1.5MB.

44. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know

19

the passcodes of the devices likely to be found in the search.

c.    The person who was in possession of a device or had the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ELIZALDE's thumb- and/or fingers on the SUBJECT DEVICE; and (2) hold the SUBJECT DEVICE in front of ELIZALDE face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

45. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

46. For all the reasons described above, there is probable cause to believe that ELIZALDE violated Title 8, United States Code, Section 1326(a), Illegal Alien Found in the United States Following Removal or Deportation, and Title 21, United States Code, Section 841, Possess with Intent to Distribute a Controlled Substance.

47. Furthermore, there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be found on the SUBJECT DEVICE as described above and in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 17th day of
September 2025.


_____
HONORABLE A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE